## COLORADO NATIONAL BANK OF DENVER *v.* BEDFORD.

No. 719. Argued April 2, 3, 1940.—Decided April 22, 1940.

---

[20] *Id.,* 197.
[21] Cf. *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95, 108.

42

*Mr. Walter W. Blood,* with whom *Mr. Frank N. Bancroft* was on the brief, for appellant.

*Messrs. George K. Thomas,* Assistant Attorney General of Colorado, and *Henry E. Lutz,* Deputy Attorney General, with whom *Messrs. Byron G. Rogers,* Attorney General, and *Elmer P. Cogburn,* Assistant Attorney General, were on the brief, for appellee.

MR. JUSTICE REED delivered the opinion of the Court.

This appeal involves the validity of the Public Revenue Service Tax Act of Colorado.[1]  The act, § 5, imposes upon the services specified in the act, a percentage tax based upon the value of the services rendered or performed by any person subject to its provisions.

[1] Session Laws of Colorado, 1937, c. 240, p. 1144.  The act was amended and reënacted May 1, 1939.  Session Laws of Colorado, 1939, c. 158, p. 526.  This later act is not material in this appeal.

44

Section 5 (c) imposes a tax equivalent to two per cent of the value of services rendered by "banks, finance companies, trust companies and depositories . . ." The person rendering the services "shall be liable and responsible for the payment of the entire amount . . ." § 6. He is required to remit all taxes collected and due the state from him to the treasurer less three per cent to cover the expense of the service. Under § 6 (B) persons rendering or performing the services are required "as far as practicable, [to] add the tax imposed . . . to the value of services or charges showing such tax as a separate and distinct item and when added such tax shall constitute a part of such value of service or charge, shall be a debt from the user to the person rendering or performing service until paid, and shall be recoverable at law in the same manner as other debts." By subsection (d) the person rendering the service is forbidden to hold out directly or indirectly that he will assume or absorb the tax. By § 7 the user may recover illegally collected taxes. Where services are rendered which become a part of an article subject to a sales tax, the services are exempt and the person performing the service recovers where they are illegally assessed. § 3. By § 12, all sums paid by the user as taxes are public money and trust funds of the State of Colorado. It is made a misdemeanor, § 17, for any person rendering or performing services to refuse to make the returns required. The state treasurer is made administrator of the act and given authority to issue regulations. § 19. The usual separability clause is contained in the act. § 22.

The definitions of the act appear in § 2. By its subsection (c) the term "services rendered or performed" is defined as those rendered for a valuable consideration by a person covered by the act for the ultimate user thereof.

"The term 'user' shall mean the person for whom or for whose benefit services are rendered or performed."

By subsection (e) taxpayer is defined as "any person obligated to account to the state treasurer for taxes collected or to be collected or due the state under the terms of this act." Subsection (h) provides for a credit on future taxes of a tax paid on accounts eventually found worthless.

Under the rules and regulations issued by the treasurer on the Public Revenue Service Tax Act, the service tax is construed as invalid as applied to so-called banking services.[2]

Under rule 27, however, such service as the furnishing of safety vaults by depositories or banks is held to come within the act, and the two per cent tax applies to the charges made for this service. These regulations were approved by the judgment and decree of the trial court and that judgment was affirmed in all particulars by the Supreme Court of Colorado.

While § 4 (a) makes it unlawful for any person to render the defined services without "first having obtained a license therefor," the treasurer demands no license fees from a national bank. Such exception was held proper by the lower court.[3]

The appellant here, the Colorado National Bank, was a national banking corporation duly organized and existing under the national banking act. The bank operated a safe-deposit service under its own name and in the building and vaults used for its other banking activities. The rentals received for the use of that portion of its vaults utilized for safe-deposit boxes were reported to the Comptroller of the Currency as income in the bank; the fixtures employed in the business are part of the assets of the bank and are supervised by the Comptroller of the Currency.

---

[2] Rules and Regulations, Public Revenue Service Tax Act of 1937, No. 10, republished October 27, 1937.

[3] *Bedford* v. *Colorado Bank,* 104 Colo. 311, 315; 91 P. 2d 469.

The appellee Bedford, as treasurer of the State of Colorado and administrator of the Service Tax Act, demanded payment from appellant bank of two per cent of the value of the services rendered by the bank to its safe deposit box customers. The bank refused payment and the treasurer brought this action under the Uniform Declaratory Judgments Act (Colorado Stat. Anno., 1935, c. 93, §§ 78–79) for a declaration of rights to the effect that the services performed by the bank are taxable pursuant to the Service Tax Act. The bank answered claiming the state statute as applied to it was repugnant to the Constitution and laws of the United States; setting up the immunity of national banks from state taxation except as permitted by R. S. § 5219; [4] claiming that the safe-deposit business of national banks was authorized by Congress and therefore was part of its federally authorized business, immune from taxation whether the bank or the user of its services is the taxpayer. The bank further contended that even though it is not the taxpayer and the tax burden as such is not unlawful, the burden of collection, report and visitation materially interfere with the performance of its national banking functions. A general demurrer to the answer was filed.

The trial court sustained the bank. The supreme court first affirmed by an equally divided court and then on re-

---

[4] 12 U. S. C. § 548.

"The legislature of each State may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several States may (1) tax said shares, or (2) include dividends derived therefrom in the taxable income of an owner or holder thereof, or (3) tax such associations on their net income, or (4) according to or measured by their net income, provided the following conditions are complied with:

"1. (a) The imposition by any State of any one of the above four forms of taxation shall be in lieu of the others, except as hereinafter provided in subdivision (c) of this clause."

hearing reversed [5] and remanded the case to the district court. The trial court entered a second judgment declaring as prayed by the treasurer which judgment was affirmed by the supreme court on the authority of the former decision.

(1) This appeal is here under § 237 (a) of the Judicial Code. The treasurer makes the point that as the federal question raised was the immunity to the exaction of the bank as a federal instrumentality withdrawn from state taxation by congressional action, the determination that the tax was on a non-banking activity foreign to its federal character and on the user of the services eliminated the necessity of a decision on the federal question. As the statute was held valid after the conclusion of the Supreme Court of Colorado that the manner of state taxation of national banks must accord with R. S. § 5219 and must not interfere with federal functions,[6] it seems clear the federal question as to the validity of the statute as tested by the Constitution and laws of the United States was necessarily involved and decided. This gives this Court jurisdiction of the appeal.[7]

*Gully* v. *First National Bank*,[8] relied upon by the treasurer, dealt with the right to remove to a federal court [9] because the cause of action arose under the federal laws,[10] but the issue here is the right to appeal where a state statute is held valid against a defense of repugnancy to the same laws.[11] The difference is brought out

---

[5] *Bedford* v. *Colorado Bank, supra.*

[6] *Ibid.*

[7] *California Powder Works* v. *Davis*, 151 U. S. 389, 393; *Indiana ex rel. Anderson* v. *Brand*, 303 U. S. 95, 98; cf. *Owensboro National Bank* v. *Owensboro*, 173 U. S. 664; *Clement National Bank* v. *Vermont*, 231 U. S. 120; *Federal Land Bank* v. *Crosland*, 261 U. S. 374.

[8] 299 U. S. 109.

[9] Judicial Code, § 28.

[10] Judicial Code, § 24.

[11] Judicial Code, 237(a).

48

in the *Gully* case, where it is said: "If there were no federal law permitting the taxation of shares in national banks, a suit to recover such a tax would not be one arising under the Constitution of the United States, though the bank would have the aid of the Constitution when it came to its defense." [12]

(2) The genesis of the present system of national banks is the National Bank Act of June 3, 1864.[13] It was called "An Act to provide a National Currency, secured by a Pledge of United States Bonds and to provide for the Circulation and Redemption thereof." From this act, correlated with the Federal Reserve Act,[14] there has developed the present nationwide banking facilities. R. S. § 5153 makes these associations the depositories of public money. Though the national banks' usefulness as an agency to provide for currency has diminished markedly, their importance as general bankers shows a constant growth.[15] We may assume that national banks possess only the powers conferred by Congress.[16] These are set out in R. S. § 5136 as frequently amended and include "all such incidental powers as shall be necessary to carry on the business of banking," with the proviso "that in carrying on the business commonly known as the safe-

---

[12] 299 U. S. at 115.

[13] 13 Stat. 99, 100.

[14] 38 Stat. 251.

[15] April 6, 1940, Treasury Daily Statement shows $172,081,172 in national bank notes outstanding on March 1, 1940. Compare with $1,122,452,661 outstanding October 31, 1914. Report of the Comptroller of Currency, 1935, p. 833. On March 1, 1940, there was outstanding over $5,000,000,000 in Federal Reserve notes.

The number of national banks as of October 31, 1938, is 5247, capital accounts (capital surplus and undivided profits) $3,305,575,000, and deposits $27,103,881,000. Report of the Comptroller of the Currency, 1938.

[16] *Texas & Pacific Ry. Co.* v. *Pottorff*, 291 U. S. 245, 253; *Marion* v. *Sneeden*, 291 U. S. 262.

deposit business the association shall not invest in the capital stock of a corporation organized under the law of any State to conduct a safe-deposit business in an amount in excess of 15 per centum of the capital stock of the association actually paid in and unimpaired and 15 per centum of its unimpaired surplus." [17]   We have recently found the authority to secure federal funds within these incidental powers, coupled with a long continued practice recognized by the Comptroller of the Currency.[18]   The right to accept special deposits is recognized by the banking act.[19]   These are monies and other valuables the identical deposits of which are kept, preserved and returned in kind.   It differs little if at all from a safe-deposit business.   The language of the proviso of § 24, just quoted, is the language suitable to impose restrictions on a recognized power, not the language that would be used in creating a new power.   As the limitation on the power to invest in real estate protected in a measure customers and stockholders from risky investments,[20] the banks' own investment in safety deposit facilities evidently did not seem to Congress to require the same regulation as the purchase of stock in a safe-deposit corporation.   A subsidiary safe-deposit corporation would give priority to the creditors of the subsidiary over the depositors and other creditors of the bank itself. The obvious fact, known to all, is that national banks do and for many years have carried on a safe-deposit business.   State banks, quite usually, are given the power to

---

[17] 12 U. S. C. § 24.

[18] *Inland Waterways Corporation* v. *Young,* 309 U. S. 517.

[19] R. S. 5228, 12 U. S. C. § 133.

[20] 12 U. S. C. § 29:

"A national banking association may purchase, hold, and convey real estate for the following purposes, and for no others:

"First. Such as shall be necessary for its accommodation in the transaction of its business."

50

conduct a safe-deposit business.[21]   We agree with the appellant bank that such a generally adopted method of safeguarding valuables must be considered a banking function authorized by Congress.[22]

(3) We may assume, as did the Supreme Court of Colorado, that the tax is invalid if laid upon the bank as an instrumentality of government in the incidents referred to in the preceding section;[23] that its banking operations are free from state taxation except as Congress may permit;[24] that Congress permits the taxation only of shares and real estate;[25] and that Congress may inter-

---

[21] Paton's Digest, 1926, Vol. 2, p. 2246, lists 24 states and territories which authorize their banks to conduct a safe-deposit business. For example, Maine, Act of 1923, c. 144, § 6, (V), authorizes savings banks to "own, maintain and let safe deposit boxes and vaults." Ohio, Gen. Code (1921), § 710-109, empowers banks to let out safe-deposit boxes. California, Gen. Laws (1923), Act 652, § 30, any bank may conduct a safe-deposit department, but shall not invest more than one tenth of its capital and surplus in such safe-deposit department.

[22] The language of the proviso first appeared in an act to further amend the national banking laws of the Federal Reserve Act enacted February 25, 1927, 44 Stat. 1224, § 2 (b).   Only immaterial verbal changes have occurred since the first adoption.

Referring to this proviso the House report said: "The second proviso regulates the safe-deposit business of national banks and prohibits them from investing an amount in excess of 15 per cent of capital and surplus in a corporation organized to conduct a safe-deposit business in connection with the bank.   This is a business which is regularly carried on by national banks and the effect of this provision is also primarily regulative."   H. Rep. No. 83, 69th Cong., 1st Sess., p. 4.

[23] Cf. *Osborn* v. *U. S. Bank*, 9 Wheat. 738, 862; *Owensboro National Bank* v. *Owensboro*, 173 U. S. 664, 668; *Bank of California* v. *Richardson*, 248 U. S. 476, 483.   Also *Smith* v. *Kansas City Title Co.*, 255 U. S. 180, 212.

[24] *Farmers' & Mechanics' National Bank* v. *Dearing*, 91 U. S. 29; *Easton* v. *Iowa*, 188 U. S. 220; *First National Bank* v. *California*, 262 U. S. 366

[25] R. S. § 5219; *Owensboro National Bank* v. *Owensboro*, 173 U. S. 664, 668, 676.

vene to protect its instrumentalities from any other tax which threatens their usefulness.[26]

Congress has not legislated against taxation of the customers of national banks. This Court has approved a tax assessed upon the deposits of customers of national banks.[27] By § 6 of the Colorado act the "person rendering or performing services shall be liable" for the payment of the tax imposed. But as subsection (b) of that same section requires the tax paid to be added to the charges for service "as a separate and distinct item" and makes it a debt from the user of the services until paid, the tax is upon the user of the safe-deposit boxes, not upon the bank. Furthermore, as by § 2 (h) credit is given to the bank for taxes paid on accounts subsequently found worthless and the bank is in a position to require payment of box rentals and taxes in advance, there is no occasion for a bank ever to have saddled upon it any part of the tax burden.

In *National Bank* v. *Commonwealth*[28] this Court determined a similar question in favor of the validity of the state tax. The case was decided in 1869. At that time the applicable federal statute[29] read: "Sec. 41. . . . *Provided,* That nothing in this act shall be construed to prevent all the shares in any of the said associations, held by any person . . . from being included in the valuation of the personal property of such person . . . in the assessment of taxes imposed by or under state authority at the place where such bank is located, and not elsewhere. . . ."

The statute of Kentucky laid a tax of fifty cents on each share. The same statute enacted: "The cashier of

---

[20] *Pittman* v. *Home Owners' Loan Corp.,* 308 U. S. 21, and cases cited; *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 160; *First National Bank* v. *Missouri,* 263 U. S. 640, 656.

[27] *Clement National Bank* v. *Vermont,* 231 U. S. 120, 133

[28] 9 Wall. 353.

[29] 13 Stat. 111.

a bank, whose stock is taxed, shall, on the first day in July of each year, pay into the treasury the amount of tax due. If such tax be not paid, the cashier and his sureties shall be liable for the same, and twenty per cent. upon the amount; and the said bank or corporation shall thereby forfeit the privileges of its charter."

A national bank refused payment on the ground that it as a bank was not subject to state taxation. It was decided that this was a tax on shares, that the state in a legal proceeding against the shareholder could have garnisheed the bank and that because the bank was a federal instrumentality was no reason for not requiring it to collect and pay over the money from the shareholder. A similar tax was upheld in *Des Moines Bank* v. *Fairweather*.[30]

The person liable for the tax, primarily, cannot always be said to be the real taxpayer. The taxpayer is the person ultimately liable for the tax itself.[31] The funds which were received by the State came from the assets of the user, not from those of the federal instrumentality, the bank.[32] The Colorado Supreme Court holds the user is the taxpayer.[33] The determination of the state court as to the incidence of the tax has great weight with us and, when it follows logically the language of the act, as here, is controlling.[34] As the user directly furnishes the funds for the tax, not as an ultimate consumer with a transferred burden but by § 12 of the act as the responsible obligor, we conclude the tax is upon

[30] 263 U. S. 103, 111; cf. *Gully* v. *First National Bank,* 299 U. S. 109, 116.

[31] *Stahmann* v. *Vidal,* 305 U. S. 61.

[32] *Helvering* v. *Therrell,* 303 U. S. 218, 225.

[33] *Bedford* v. *Colorado Bank,* 104 Colo. 311, 319; 91 P. 2d 469; cf. *Bedford* v. *Hartman Brothers,* 104 Colo. 190, 194; 89 P. 2d 584.

[34] *Clement National Bank* v. *Vermont,* 231 U. S. 120, 134.

him, not upon the bank. The Constitution or laws of the United States do not forbid such a tax.

(4) The tax being a permissible tax on customers of the bank, it is settled by our prior decisions that the statutory provisions requiring collection and remission of the taxes do not impose an unconstitutional burden on a federal instrumentality.[35]  Especially is this true since the bank under the Colorado act is allowed three per cent of the tax for the financial burden put upon it by the obligation to collect.

*Affirmed.*

---

[35] *National Bank* v. *Commonwealth,* 9 Wall. 353; *Des Moines Bank* v. *Fairweather,* 263 U. S. 103, 111; cf. *Waite* v. *Dowley,* 94 U. S. 527; *Monamotor Oil Co.* v. *Johnson,* 292 U. S. 86, 93; Code of Iowa, 1931, § 5093a(5); *Felt & Tarrant Co.* v. *Gallagher,* 306 U. S. 62, 68; *McGoldrick* v. *Berwind-White Coal Co.,* 309 U. S. 33.