Keating, J.
 

 The question presented for our consideration is whether the Liberty National Bank and Trust Company is an instrumentality of the United States Government and, therefore, as a purchaser, is immune from sales and use taxes imposed by the State of New York and the County of Brie.
 

 There is no dispute with regard to the applicable constitutional law—the rule is clear that the Government of the United States, its agencies and instrumentalities may not be subjected to taxation by State and local governments, absent congressional consent. (See, e.g.,
 
 Department of Employment
 
 v.
 
 United States,
 
 385 U. S. 355.) The question merely is whether a national bank is an instrumentality of the Federal Government. The bank, in support of its tax-immune status, cites a long line of cases holding that a national bank is an instrumentality of the Federal Government. (See, e.g.,
 
 M'Culloch
 
 v.
 
 *360
 

 Maryland,
 
 4 Wheat. [17 U. S.] 316;
 
 Osborn
 
 v.
 
 Bank of United States,
 
 9 Wheat. [22 U. S.] 738;
 
 Owensboro Nat. Bank
 
 v.
 
 Owensboro,
 
 173 U. S. 664.) We must keep in mind, however, in reviewing these eases, that what must be determined here is in essence a question of fact — “whether [the] institution is so closely related to governmental activity as to become a tax-immune instrumentality”.
 
 (Department of Employment
 
 v.
 
 United States,
 
 385 U. S. 355, 358-359,
 
 supra.)
 

 The cases which have held that national banks are instrumentalities of the Federal Government go back almost to the beginning of our republic and involve institutions whose activities are so different and varied that their value as precedent is open to serious question. As Mr. Justice Brandeis has written in a dissenting opinion which has since been adopted by the Supreme Court: “ [T]he decision of the Court, if, in essence, merely the determination of a fact, is not entitled, in later controversies between other parties, to that sanction which, under the policy of
 
 stare decisis,
 
 is accorded to the decision of a proposition purely of law. For not only may the decision of the fact have been rendered upon an inadequate presentation of then existing conditions, but the conditions may have changed meanwhile. * * * Moreover, the judgment of the Court in the earlier decision may have been influenced by prevailing views as to economic or social policy which have since been abandoned. In cases involving constitutional issues of the [kind presented here], this Court must, in order to reach sound conclusions, feel free to bring its opinions into agreement with experience and with facts newly ascertained, so that its judicial authority may * * * ‘ depend altogether on the force of the reasoning by which it is supported.’ ”
 
 (Burnet
 
 v.
 
 Coronado Oil & Gas Co.,
 
 285 U. S. 392, 412-413
 
 [1]
 
 ; see, also,
 
 Smith
 
 v.
 
 Allwright,
 
 321 U. S. 649, 656.)
 

 The leading case in this area and a landmark decision in American jurisprudence is
 
 M‘Culloch
 
 v.
 
 Maryland (supra).
 
 It
 
 *361
 
 was in this case that the Supreme Court upheld the power of Congress to charter a national bank and, in addition, held that the bank thus created was subject to immunity from taxation “ on [its] operations ” (4 Wheat. [17 U. S.] 436).
 

 The national bank involved in
 
 M‘Culloch
 
 v.
 
 Maryland (supra)
 
 and
 
 Osborn
 
 v.
 
 Bank of United States (supra)
 
 was one in which the Federal Government subscribed to and owned 20% of the capital stock. The President of the United States had the power to appoint 5 of the 25 members of the Board of Directors and the Government participated in the election of the remaining directors. The Secretary of the Treasury was required to deposit all Federal moneys in the bank and the bank was required to transmit funds for the Federal Government without charge. Moreover, paper currency
 
 issued by the bank
 
 was made legal tender for the purpose of paying all debts owing to the Federal Government, and the bank acted as a fiscal agent for the United States and handled its foreign exchange transactions (see, generally, Studenski and Kroos, Financial History of the United States [1952], pp. 83-88, 103-106). It was in this context that Chief Justice Marshall noted that the bank was ‘ ‘ the great instrumentality by which the fiscal operations of the government are effected”
 
 (Osborn
 
 v.
 
 United States,
 
 9 Wheat. [22 U. S.] 738, 860,
 
 supra),
 
 and was thus immune from discriminatory taxes which hostile State governments sought to levy.
 
 [2]
 

 In striking down these taxes which were designed to destroy and hamper an institution which was clearly an instrumentality of the national Government, Chief Justice Marshall wrote in
 
 M‘Culloch
 
 v.
 
 Maryland (supra,
 
 pp. 436-437): “ This opinion does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the State, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout
 
 *362
 
 the State. But this is a tax on the operations of the hank, and is, consequently, a tax on the operation of an instrument employed by the government of the Union to carry its powers into execution. Such a tax must be unconstitutional. ’ ’
 

 The charter of the national bank with which
 
 M‘Culloch
 
 and
 
 Osborn
 
 dealt expired in 1836—no such bank with similar functions has been chartered by Congress since that period. The next major congressional action with regard to national banks came during the Civil War period with the enactment of the National Bank Acts of 1863-1864. While the relationships of national banks to the government under the statute was not as close as that of the earlier Bank of America, they, nevertheless, were actively engaged in the governmental function of issuing notes which served as the Nation’s currency. It was this national bank .system which the Supreme Court dealt with in
 
 Owensboro Nat. Bank
 
 v.
 
 Owensboro
 
 (173 U. S. 664,
 
 supra).
 
 In that case the court struck down a tax on the intangible property of a national bank — a tax which was also allegedly discriminatory in some respects
 
 (supra,
 
 p. 665).
 

 In
 
 Owensboro
 
 and subsequent cases which have followed, the court has continued to rely on
 
 M‘Culloch
 
 v.
 
 Maryland
 
 and
 
 Osborn
 
 v.
 
 United States
 
 without undertaking
 
 de novo
 
 examinations of the functions of the bank in each instance. (See, e.g.,
 
 First Nat. Bank
 
 v.
 
 Anderson,
 
 269 U. S. 341 [1926];
 
 First Nat. Bank
 
 v.
 
 Hartford,
 
 273 U. S. 548
 
 [1927]; Iowa-Des Moines Bank
 
 v.
 
 Bennett,
 
 284 U. S. 239 [1931];
 
 Colorado Nat. Bank
 
 v.
 
 Bedford,
 
 310 U. S. 41 [1940]; see, also,
 
 People ex rel. Bridgeport Sav. Bank
 
 v.
 
 Feitner,
 
 191 N. Y. 88 [1908];
 
 People ex rel. Hanover Nat. Bank
 
 v.
 
 Goldfogle,
 
 234 N. Y. 345 [1922].) While such reliance may have been justified during the period when national banks continued to issue currency—a function which terminated in 1935, we believe the time has come when the tax-immune status of national banks must be re-examined in light of both their present-day function as well as other Supreme Court decisions which have set forth criteria for making determinations similar to that which we are required to make here.
 

 An examination of the Supreme Court’s decisions in this area reveals a general curtailment of the class of instrumentalities which are viewed as tax immune. The court appears to be placing greater stress upon the nature of the tax and its actual
 
 *363
 
 effect upon the furtherance of the governmental functions involved rather .than relying upon a ‘‘ mechanical application of the rule that government instrumentalities are immune from taxation”.
 
 (Educational Films Corp.
 
 v. Ward, 282 U. S. 379, 391-392.)
 
 [3]
 

 The earliest and most significant of these decisions is
 
 Railroad Co.
 
 v.
 
 Peniston
 
 (18 Wall. [85 U. S.] 5 [1873]). In that case the
 
 Union Pacific Railroad Company, a corporation chartered by Congress,
 
 challenged a tax laid upon its property by a subdivision of the State of Nebraska. The Supreme Court proceeded first to consider the arguments advanced in support of the railroad’s argument that it was an instrumentality of the United States to the extent that it was entitled to the same tax immunity as the government itself:
 

 ‘‘ It is insisted on behalf of the plaintiffs that the tax of which they complain has been laid upon an agent of the General government constituted and organized as an instrument to carry into effect the powers vested in that government by the Constitution, and it is claimed that such an agency is not subject to State taxation. That the Union Pacific Railroad Company was created to subserve, in part at least, the lawful purposes of the National government; that it was authorized to construct and maintain a railroad and telegraph line along the prescribed route, and that grants were made to it, and privileges conferred upon it, upon condition that it should at all times transmit dispatches over its telegraph line, and transport mails, troops, and munitions of war, supplies and public stores, upon the railroad for the government, whenever required to do so by any department thereof, and that the government should at all times have the preference in the use of the same for all the purposes aforesaid, must be conceded. Such are the plain provisions of its charter. So it was provided that in case of the refusal or failure of the company to redeem the bonds advanced to it by the government, or any part of them, when lawfully required by the Secretary of the Treasury, the road,
 
 *364
 
 with all the rights, functions, immunities, and appurtenances thereunto belonging, and also all lands granted to the company by the United States which at the time of the default should remain in the ownership of the company, might be taken possession of by the Secretary of the Treasury for the use and benefit of the United States. The charter also contains other provisions looking to a supervision and control of the road and telegraph line, with the avowed purpose of securing to the government the use and benefit thereof for postal and military purposes. It is unnecessary to mention these in detail. They all look to a purpose of Congress to secure an agency competent and under obligation to perform certain offices for the General government. Notwithstanding this, the railroad and the telegraph line are neither in whole nor in part the property of the government. The ownership is in the complainants, a private corporation, though existing for the performance of public duties. The government owns none of its stock, and though it may appoint two of the directors, the right thus to appoint is plainly reserved for the sole purpose of enabling the enforcement of the engagements which the company assumed, the engagements to which we have already alluded.
 

 ‘‘ Admitting, then, fully, as we do, that the company is an agent of the General government, designed to be employed, and actually employed, in the legitimate service of the government, both military and postal, does it necessarily follow that its property is exempt from State taxation? ” (pp. 31-32).
 

 The court proceeded to answer the question in the negative. It rejected the argument that, merely because the corporation received its charter from the Federal Government, it was a tax-immune instrumentality and it outlined the dangers which would result if all those private corporations which performed services for the government were exempt from State taxation:
 
 ‘ ‘
 
 It may, therefore, be considered as settled that no constitutional implications prohibit a State tax upon the property of an agent of the government merely because it is the property of such an agent. A contrary doctrine would greatly embarrass the States in the collection of their necessary revenue without any corresponding advantage to the United States. A very large proportion of the property within the States is employed in execution of the powers of the government. It belongs
 
 *365
 
 to governmental agents, and it is not only used, but it is necessary for their agencies. United States mails, troops, and munitions of war are carried upon almost every railroad. Telegraph lines are employed in the National service. So are steamboats, horses, stagecoaches, foundries, ship-yards, and multitudes of manufacturing establishments. They are the property of natural persons, or of corporations, who are instruments or agents of the General government, and they are the hands by which the objects of the government are attained. Were they exempt from liability to contribute to the revenue of the States it is manifest the State governments would be paralyzed. While it is of the utmost importance that all the powers vested by the Constitution of the United States in the General government should be preserved in full efficiency, and while recent events have called for the most unembarrassed exercise of many of those powers, it has never been decided that State taxation of such property is impliedly prohibited” (p. 33).
 

 The court held that, as long as the tax did not interfere with the performance of the function served by the private corporation involved, it was not
 
 impliedly
 
 immune from the State taxation.
 

 The
 
 Peniston
 
 case was followed in
 
 Broad Riv. Power Co.
 
 v.
 
 Query
 
 (288 U. S. 178), in which the court upheld a tax on the production and sale of electricity generated by a hydroelectric company which constructed and operated its plant by permission and under supervision of the Federal Government. The court, speaking through Chief Justice Hughes, wrote (pp. 180-181): “It is apparent, however, that the complainant in generating and selling power is not acting as an agent for the Government. It acts with the Government’s permission, and while it may be said to have received a privilege from the Government, it is not a privilege to be exercised on behalf of the Government. The tax is not upon the exertion of, and cannot be said to burden, any governmental function. * * * The tax is not laid upon the license granted by the Federal Water Power Commission but upon the production and sale of power which the company generates at its own pleasure and exclusively for its own profit. Notwithstanding the special characteristics of electrical energy, the company is engaged
 
 *366
 
 in producing and selling an article of trade. * * * The product is property. The fact that a privilege has been received from the Federal Government does not exempt that property or the local business in producing and selling it from the burdens of taxation otherwise valid.” (See, also,
 
 Williams
 
 v.
 
 Talladega,
 
 226 U. S. 404, 416;
 
 Western Union Tel. Co.
 
 v.
 
 Massachusetts,
 
 125 U. S. 530, 549;
 
 Alward
 
 v.
 
 Johnson,
 
 282 U. S. 509;
 
 Indian Territory Illuminating Oil Co.
 
 v.
 
 Board of Equalisation,
 
 288 U. S. 325.)
 

 It is clear from the cases cited and discussed that privately owned and operated business enterprises which perform services for the government and/or exist and operate by virtue of a Federal charter or franchise arc not per se immune from nondiscriminatory State taxation which does not impede the performance of their service for government or the privilege granted by the government charter or franchise. As Justice Stone wrote in upholding a New York State nondiscriminatory tax upon a corporate franchise, notwithstanding the inclusion of tax exempt income in the measure of it:
 
 “
 
 This Court, in drawing the line which defines the limits of the powers and immunities of state and national governments, is not intent upon a mechanical application of the rule that government instrumentalities are immune from taxation, regardless of the consequences to the operations of government. The necessity for marking those boundaries grows out of our Constitutional system, under which both the federal and the state governments exercise their authority over one people within the territorial limits of the same state. The purpose is the preservation to each government, within its own sphere, of the freedom to carry on those affairs committed to it by the Constitution, without undue interference by the other.”
 
 (Educational Films Corp.
 
 v.
 
 Ward,
 
 282 U. S. 379, 391-392; see, also,
 
 Reconstruction Fin. Corp.
 
 v.
 
 Beaver,
 
 328 U. S. 204; cf.
 
 United States
 
 v.
 
 Yazell,
 
 382 U. S. 341.)
 

 We turn then to the original question posed—given the background of the cases upon which the Liberty National Bank and Trust Company relies and the further decisions of the Supreme Court in defining instrumentalities for tax immunity purposes, is the bank entitled to a constitutionally implied immunity from
 
 *367
 
 State taxation as an instrumentality of the Federal Government? We conclude that the answer is that it clearly is not.
 

 National banks, though federally chartered, are privately owned and operated primarily for the private benefit of their owners. Like State chartered banks, they are depositories for Federal funds — indeed, legislation forbids discrimination for that purpose between State and national banks which are members of the Federal Reserve System (U. S. Code, tit. 12, § 265).
 
 [4]
 
 In addition, like any private enterprise or individual engaging in activities affected with a public interest, they are subject to severe Government regulation. This regulation, accomplished via membership in the Federal Reserve System (membership which is open to State banks on a voluntary basis [U. S. Code (1964), tit. 12, § 321]), is, however, hardly sufficient to render national banks instrumentalities of the Federal Government so as to entitle them to the same immunity from taxation as the Government itself.
 
 (Railroad Co.
 
 v. Peniston,
 
 supra; Broad Riv. Power Co.
 
 v.
 
 Query,
 
 supra;
 
 Western Union Tel. Co.
 
 v.
 
 Massachusetts, supra;
 
 cf.
 
 Spevack
 
 v.
 
 Klein,
 
 385 U. S. 511, 520 [concurring opn. of Fortas, J.]).
 

 Moreover, we are dealing here with a nondiscriminatory tax, immunity from which, it is conceded, will give national banks no more than an ‘ ‘ imperceptible economic advantage ’ ’ (respondent’s brief, p. 18) over their State competitors and we assume, conversely, that nonimmunity from the tax will have little or no effect on their operations or the services they perform for the Government. Under these circumstances, we see no basis in law or logic for immunizing national banks from the taxation with which we are concerned here.
 

 Such cases as
 
 Colorado Nat. Bank
 
 v.
 
 Bedford
 
 (310 U. S. 41,
 
 supra)
 
 and
 
 Department of Employment
 
 v.
 
 United States
 
 (385 U. S. 355,
 
 supra)
 
 upon which the bank relies do not conflict with this conclusion. '
 

 In the
 
 Colorado Nat. Bank
 
 case the Supreme Court held that, in the absence of contrary legislation by Congress, a State
 
 *368
 
 law laying a percentage tax on the users of the safety deposit services of banks measured by the banks’ charges for the services, and requiring the banks to collect the taxes and account for them to the State and include them in their bills for the services, was valid.
 

 The case was decided in 1940, and the court recognized that the national bank’s usefulness as an agency to provide for currency “ has diminished markedly” (p. 48) and merely “
 
 assum[ed]
 
 * * * that its banking operations are free from state taxation except as Congress may permit” (p. 50; emphasis added).
 

 The basis of the court’s decision was that the tax was not on the bank as the owner of the safe deposit box but rather that it was upon the customer as. the user. If the tax had been upon the bank as the owner of the box, the bank would have passed the tax on to the customer and, since it was responsible for the collection of the tax in any event, it becomes rather clear that the distinction drawn by the court was one without a difference.
 

 The court went on to note significantly that the burden placed upon the bank to collect and remit the tax did not pose an unconstitutional burden.
 

 In light of the court’s language as well as the result reached, we cannot agree that this case precludes us from reconsidering prior case law. Indeed, highly technical distinctions of the kind made by the court in deciding this case, in areas badly in need of re-examination, have often been preludes to the ultimate rejection of old and no longer rational precedent. (Compare
 
 Goldman
 
 v.
 
 United States,
 
 316 U. S. 129, and
 
 Silverman
 
 v.
 
 United States,
 
 365 U. S. 505, with
 
 Katz
 
 v.
 
 United States,
 
 389 U. S. 347.)
 

 The reasoning of the second case relied on by the bank clearly supports our conclusion regarding the status of national banks. In
 
 Department of Employment
 
 v.
 
 United States (supra)
 
 the court held that the American National Red Cross was a tax-immune instrumentality of the Federal Government. The court’s analysis is significant and instructive. Mr. Justice Fortas, speaking for the court, wrote (385 U. S.,
 
 supra,
 
 pp. 358-360): “ Although there is no simple test for ascertaining whether an institution is so closely related to governmental activity as to
 
 *369
 
 become a tax-immune instrumentality, the Red Cross is clearly such an instrumentality * * * Congress chartered the Red Cross in 1905, subjecting it to governmental supervision and to a regular financial audit * * * Its principal officer is appointed by the President, who also appoints seven (all government officers) of the remaining 49 Governors * * * By statute and Executive Order there developed upon the Red Cross the right and obligation to meet this Nation’s commitments under various Geneva Conventions, to perform a wide variety of functions indispensible to the workings of our Armed Forces around the globe, and to assist the Federal Government in providing disaster assistance to the States in time of need. Although its operations are financed primarily from voluntary private contributions, the Red Cross does receive substantial material assistance from the Federal Government. And time and time again, both the President and the Congress have recognized and acted in reliance upon the Red Cross’ status as an arm of the Government. ’ ’
 

 The contrast between activities and functions of the American National Red Cross and that of the Liberty National Bank and Trust Company is so striking that no further elaboration is required.
 

 We must note, however, as the bank points out, that there is dictum in the Red Cross opinion which supports its contention on this appeal. Thus the court wrote (p. 360): “ In those respects in which the Red Cross differs from the usual government
 
 agency—e.g.,
 
 in that its employees are not employees of the United States, and that government officials do not direct its everyday affairs — the Red Cross is like other institutions —
 
 e.g.,
 
 national banks—whose status as tax-immune instrumentalities of the United States is beyond dispute.”
 

 If the Supreme Court had dealt with the precise problem with which we are concerned here—namely the status of national banks—we would, of course, follow that decision without question. We believe that the court’s reference to national banks is clearly understandable in the context in which it was rendered, since the precedents cited and discussed earlier have never been rejected and the status of national banks as tax-immune instrumentalities was not disputed in that case. It is obvious, however, that the
 
 reasoning
 
 of the court’s decision and
 
 *370
 
 its holding squarely support the position we take here and the similar position recently taken by the Supreme Judicial Court of Massachusetts
 
 (First Agric. Nat. Bank of Berkshire County
 
 v.
 
 State Tax Comm.,
 
 229 N. E. 2d 245 [Mass., 1967]). Until the Supreme Court holds that
 
 national hanks of today
 
 are to be deemed immune from contributing their fair share of the taxes necessary to enable State and local governments to provide the essential services from which the banks themselves benefit, we decline to do so.
 

 We, of course, recognize that, even though the bank is not automatically entitled to a constitutional immunity from taxation, Congress has the power to immunize national banks and other federally chartered institutions from this type of taxation. There is, however, no such statute presently in effect.
 

 Section 548 of title 12 of the United States Code, the only Federal statute dealing with State taxation of national banks, is merely designed to insure that the inherent taxing powers which were recognized in
 
 M‘Culloch
 
 v.
 
 Maryland (supra)
 
 — e.g., the power to tax the real property of the banks as well as the privately owned shares — be exercised in a nondiscriminatory fashion. As the Supreme Court recently wrote: ‘‘ Congress enacted the Section in 1864 and this Court has passed on it over 55 times in the near century of the Section’s existence. During that period the Court has kept clearly in view, as was said in the last case in which it wrote, that ‘ the various restrictions [§ 548] * * * places on the permitted methods of taxation are designed to prohibit only those systems of state taxation which discriminate in practical operation against national banking associations or their shareholders as a class.’ ”
 
 (Michigan Nat. Bank
 
 v.
 
 Michigan,
 
 365 U. S. 467, 472-473.)
 

 There is nothing whatever in the statute which indicates an intent to immunize national banks from nondiscriminatory State taxation such as this and ‘‘ [T]he immunity formerly said to exist on constitutional implication cannot now be resurrected in the form of statutory implication”
 
 (Oklahoma Tax Comm.
 
 v.
 
 United States,
 
 319 U. S. 598, 604). ‘‘ If it appears that there is no ground for implying a constitutional immunity, there is equally a want of any ground for assuming any purpose on the part of Congress to create an immunity.”
 
 (Graves
 
 v.
 
 New York
 
 
 *371
 

 ex rel. O’Keefe,
 
 306 U. S. 466, 480, supra; see, also,
 
 Oklahoma Tax Comm.
 
 v.
 
 Texas Co.,
 
 336 U. S. 342, 365-366.)
 

 We note in conclusion that the problems which face State and local governments in meeting their responsibilities in our complex society require the expenditure of vast amounts of money. The Liberty National Bank and Trust Company has not presented us with a single rational argument, aside from a string of cases which were relevant in another time and under different circumstances, why it should not, like any other individual or business enterprise, contribute to the costs. We perceive none.
 

 We wish to take special note of the exceptionally well-written and researched briefs submitted by both parties.
 

 The order of the Appellate Division upholding the tax immune status of the Liberty National Bank and Trust Company should be reversed, with costs, and the petition should be dismissed.
 

 Chief Judge Fuld and Judges Van Voorhis, Burke, Scileppi, Bergan and Breitel concur.
 

 Order reversed, etc.
 

 [1]
 

 . The majority opinion from which Mr. Justice Brandeis dissented as well as the precedent which he would have no longer followed were overruled in
 
 Helvering
 
 v.
 
 Producers Corp.
 
 (303 U. S. 376, 387). The issue in those cases involved a question of the amenability of government instrumentalities to taxation. The court ultimately determined that leases of State-owned property — contrary to prior decision — were not instrumentalities of the State.
 

 [2]
 

 . In
 
 M‘Culloch
 
 v.
 
 Maryland (supra)
 
 the State sought to tax the currency issued by the national bank — a tax on the very performance of a governmental function and in
 
 Osborn
 
 the State imposed a $50,000 tax on each office. In both instances the tax was blatantly discriminatory as no similar tax was imposed on State banks.
 

 [3]
 

 .
 
 “
 
 [T]he implied immunity of one government and its agencies from taxation by the other should, as a principle of constitutional construction, be narrowly restricted. For the expansion of the immunity of one government correspondingly curtails the sovereign power of the other to tax”.
 
 (Graves
 
 v.
 
 New York ex rel. O’Keefe,
 
 306 U. S. 466, 483.)
 

 [4]
 

 . Over one fourth of all moneys subject to Federal Reserve System Regulation are in such State chartered banks. (National Summary of Accounts and Deposits in All Commercial Banks, Federal Deposit Insurance Corporation, June 30, 1966.)