359 So.2d 294 (1978)
Lewis A. GIRAUD, Mrs. Elvira Louise Wiener Giraud, Mrs. Corinne Rotge Panquerne, Gerald L. Schroeder, Decatur Realty Corporation and Thomas L. Giraud
v.
CITY OF NEW ORLEANS and the Hon. Henry Simmons, Director of the Department of Finance of the City of New Orleans as Tax Collector of the City of New Orleans.
DECATUR REALTY CORPORATION
v.
CITY OF NEW ORLEANS.
Nos. 9064, 9065.
Court of Appeal of Louisiana, Fourth Circuit.
May 10, 1978.
Rehearings Denied June 13, 1978.
*295 Thomas L. Giraud and Charles A. Verderame, New Orleans, for plaintiffs-appellants Lewis L. Giraud, et al.
Sidney M. Bach, New Orleans, for plaintiff-appellant Decatur Realty corp.
Philip S. Brooks, City Atty., Jackson P. McNeely, and Lee R. Miller, Jr., Asst. City Attys., for defendants-appellants the City of New Orleans and Henry Simmons.
William J. Guste, Jr., Atty. Gen., Warren E. Mouledoux, First Asst. Atty. Gen., Robert L. Danner, Jr., Asst. Atty. Gen., for defendant-appellant the Louisiana Tax Commission.
Before GULOTTA, BEER and GARSAUD, JJ.
GARSAUD, Judge.
These consolidated cases were brought by owners of real property in the Second and Third Municipal Districts of the city of New Orleans. The property owners contested certain procedures followed by the Orleans Parish Board of Review and the Louisiana Tax Commission in increasing assessments on vacant land in those districts for the 1976 tax year.[1] In case No. 76-15514 (Court of Appeal No. 9064), all plaintiffs petitioned for a writ of mandamus ordering that the City of New Orleans, through its appropriate directors, accept payment of 1976 real property taxes on the basis of the official tax assessment rolls as submitted to the Louisiana Tax Commission by the assessors *296 in the Second and Third Municipal Districts, which figures were less than the assessments finally promulgated by the Commission. The trial court denied this writ, and plaintiffs then sought to overturn the denial by petitioning this Court for a writ which was refused in case No. 8249.
Thereafter, plaintiffs filed a supplemental and amending petition in the district court. In this supplemental and amending petition, plaintiffs sought a declaratory judgment and other equitable relief decreeing that the taxes were illegally assessed and illegally collected. Plaintiffs Decatur Realty Corporation and Henry Bermingham, who had paid the taxes assessed and then filed a protest, filed a petition for recovery of taxes under R.S. 47:2110, in this suit as well as in the consolidated case for Decatur Realty, case No. 76-16467 (Court of Appeal No. 9065).
The trial court dismissed the suit of all plaintiffs who had not paid their taxes and brought protest under R.S. 47:2110. As plaintiffs Decatur Realty Corporation and Henry Bermingham had paid their taxes under protest, the trial court ordered that the sum of the difference of the amount of taxes paid under protest and the amount of taxes payable to the City of New Orleans based upon the valuation as originally fixed by the assessors be reimbursed to plaintiffs. The trial court further ordered
"that the City of New Orleans refund to other taxpayers in the same category as Decatur Realty Corporation, who paid their taxes under protest and gave notice of their intention to file suit, upon satisfying the City of New Orleans that the provisions of R.S. 47:2110 have been met."
The plaintiffs who had brought the action for declaratory judgment and whose suit was dismissed have appealed the decision of the trial court. The City of New Orleans and the Louisiana Tax Commission have appealed that part of the decision rendered in favor of those plaintiffs who paid their taxes under protest.
With regard to the question of whether the declaratory judgment is an appropriate vehicle for bringing this claim, we agree with the trial court that the remedy provided by R.S. 47:2110 is the exclusive method for attacking the action of the taxing authorities here. R.S. 47:2110 states in part as follows:
"A. No court of this state shall issue any process whatsoever to restrain the collection of an ad valorem tax imposed by the state, or by any political subdivision thereof, under authority granted to it by the legislature or by the constitution. Any person resisting the payment of any amount of tax found due, or the enforcement of any provision of the tax laws in relation thereto, shall pay the amount found due to the officer designated by law for the collection of such tax and shall give the officer notice at the time of payment of his intention to file suit for the recovery of such tax. Upon receipt of such notice, the amount so paid shall be segregated and held by the officer for a period of thirty days. If suit is filed within such time for the recovery of the tax, such amount so segregated shall be further held pending the outcome of the suit. If the taxpayer prevails, the officer shall refund the amount to the taxpayer with interest at the rate of two per centum per annum for the period from the date such funds were received by the officer to the date of such refund.
"B. The right to sue for recovery of a tax paid under protest as provided herein shall afford a legal remedy and right of action in any state or federal court having jurisdiction of the parties and subject matter for a full and complete adjudication of any and all questions arising in the enforcement of such right respecting the legality of any tax accrued or accruing or the method of enforcement thereof. In any such suit, service of process upon the officer designated by law for the collection of the tax shall be sufficient service, and he shall be the sole necessary and proper party defendant in any such suit."
The language is mandatory and unambiguous, and simply does not permit a *297 court to issue any process whatsoever to restrain the collection of an ad valorem tax. Plaintiffs-appellants cite the case of Colorado National Bank of Denver v. Bedford, 310 U.S. 41, 60 S.Ct. 800, 84 L.Ed. 1067 (1940) for the proposition that a suit for a declaratory judgment may be used to determine the constitutionality and application of a tax statute. We do not believe that case is applicable, as in that instance there was no allegation that the state legislature provided any specific relief for recovery of taxes, as there was in this case. Further, the Colorado National Bank suit was not brought by a taxpayer, but instead by the taxing authority itself, whose only method of pursuing a legal claim in its role was through the Declaratory Judgments Act of the state of Colorado. Rather, the suit before us is governed by the case of Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943), where Act 330 of 1938 (the source of the present R.S. 47:2110) was considered vis-a-vis a claim that relief could be granted in federal court under the federal Declaratory Judgments Act. In that case, the United States Supreme Court held that, as Louisiana provided a remedy for contesting and challenging a tax, an action for declaratory judgment was inappropriate. As the Court stated,
"With due regard for these considerations, it is the court's duty to withhold such relief [declaratory judgment] when, as in the present case, it appears that the state legislature has provided that on payment of any challenged tax to the appropriate state officer, the taxpayer may maintain a suit to recover it back." Great Lakes Dredge & Dock Co. v. Huffman, supra, at 300, 301, 63 S.Ct. at 1074.
See also, Ford Motor Credit Company v. Louisiana Tax Commission, 321 F.Supp. 1365 (E.D.La.1971).
Accordingly, we affirm the trial court's decision insofar as it dismissed the suit of those plaintiffs who had sued exclusively under the provisions of Article 1871 of the Louisiana Code of Civil Procedure providing for declaratory judgments.
This brings us to the merits of the actions of various taxing authorities of the state and the city in this matter. As stated in plaintiffs-appellants' brief, the basic issue is whether the Orleans Parish Board of Review and the Louisiana Tax Commission complied with all laws relative to the procedure to be followed to change the official tax rolls of the assessors for the tax year 1976. The entire matter stems from certain actions of the Board of Review taken in conjunction with the preparation by the assessors of the assessed values of properties in late 1975 for purposes of the 1976 tax year. Apparently the respective assessors had agreed upon a certain valuation for vacant lands in the Second and Third Municipal Districts, which values were the same as had been on the books for 1975. The Board of Review for the Parish of Orleans, in a continuing attempt to increase and to equalize assessments of vacant lands throughout the city, sought to and did have vacant lots in the Second and Third Municipal Districts appraised by two professional appraisers. Ultimately, this resulted in increases in amounts to 20% of the "fair market value" of the property appraised.
The Board of Review contacted all owners of such property by letter, advising them that the Board of Review would recommend these assessment increases to the Louisiana Tax Commission. Included with these letters was a notice which read:
"You are hereby notified pursuant to the provisions of LSA-R.S. 47:1995 to personally appear before the Board of Review in the City Council Chambers, City Hall, New Orleans, on the nineteenth (19) day of September, 1975, at 10:00 A.M., to show cause why your assessment should not be increased. The purpose of your presence will be to appear before the Orleans Parish Board of Review which will review the assessment of your property and may either recommend an increase or decrease to your present assessment. Failure to appear on your part may be construed as your acceptance of the Staff's recommended assessment change." Decatur Realty Corporation, Exhibit #2.
*298 A special notice was run on the Times-Picayune newspaper. The notice read as follows:
"Public hearings will be held on all real estate assessment changes that have been made in the seven Municipal Districts for the Parish of Orleans while the real estate and personal property assessment rolls for the year 1976 were open for public inspection and correction in the offices of the seven Assessors for the Parish of Orleans.
"Affected property owners will be notified by certified mail to appear at a specific time and date for their hearings before the Board on the dates between September 19 and October 7, 1975.
"Those persons who have filed applications for abatement with the Assessors while the 1976 assessment rolls were open for public inspection and correction will be heard, and the Board of Reviewers will consider such other business which may come before the Board."
It should be noted that the public notice does not refer specifically to any changes made by the Board in the assessments of vacant land. Nonetheless, these plaintiff-owners appeared before the Board to register their complaints on the proposed increases on vacant lands. Subsequent thereto, a meeting was held between the Louisiana Tax Commission, some members of the Board of Review, and the two assessors in question, in which the valuation of these vacant lands was discussed. The outcome of the meeting was that the assessors requested a letter be sent to them ordering that they change their rolls to come up to the figures recommended by the Board of Review to the Tax Commission. Apparently a letter was requested by the assessors because they were reluctant to make these changes on their own, as apparently they opposed the changes. On October 23, 1975, such a letter was sent by the Tax Commission to the two assessors in question. However, when the assessment rolls were finally and officially certified by the assessors to the Tax Commission by letter of January 29, 1976, the assessors stated, in part:
"On the assessment books for the Second [Third] District the official assessments of my office are entered in black pencil. The appraisal figures recommended by the Orleans Parish Board of Review are shown, for information purposes only, with red pencil notations.
"The fact that the appraisal figures recommended by the Orleans Parish Board of Review are shown in red pencil for information purposes only is in no way to be construed that I have adopted these figures for assessment purposes. I repeat and emphasize that the official assessments of my office are entered in black pencil.
"I am also forwarding to you two sets of Recapitulation Sheets for the Second [Third] Municipal District. The official Recapitulation Sheets of my office reflect the official assessment figures on property in the Second [Third] Municipal District. The other set of Recapitulation Sheets contain the appraisal figures of the Orleans Parish Board of Reviewers and are forwarded to you for information purposes only as I have not adopted the appraisal figures of the Orleans Parish Board of Reviewers."
By letter of February 27, 1976, the Tax Commission against instructed the assessors to change the assessments. The letter stated, in part:
"We have reviewed your 1976 Real Estate assessments, the ones in black figures, and, as this Commission has used the appraisal figures recommended by the Orleans Parish Board of Review in arriving at the assessed value of land in the other districts, as well as a portion of your district, we have signed a resolution instructing you to make the necessary changes to conform with the recommendation made by the Review Board."
Assessor Hickey testified that after receiving the letter, "We just sent them down to the City with black and red. Too much erasing." Tax bills were then sent out by the City reflecting the assessments ordered by the Tax Commission.
*299 On all these facts, the trial court found "that the City of New Orleans was without right to do that which it did," and that "the Louisiana Tax Commission failed to follow the procedural law in causing the particular vacant property to be assessed differently from that which the assessors had fixed as the assessed property value." The trial court, quoting from its decision in the initial suit for injunctive relief, stated:
"To uphold the procedure which has been followed in the instant case by the Board of Review and by the Louisiana Tax Commission would be a complete usurpation of the powers and duties of the assessors and in effect would make their offices totally ineffective and useless."
The plaintiffs make two basic arguments in alleging the illegality of the actions of the Tax Commission and the Board of Review. The first, under Article VII § 23 of the 1974 Louisiana Constitution, contends that as the Tax Commission and the Board of Review did not act in concert, the action of increasing the assessment and levying the tax thereon was unconstitutional. In the alternative, the second argument is that the Board of Review (assuming that its very existence during the period January 1, 1975 January 1, 1978 is constitutional) and the Tax Commission have not followed the various statutory provisions applying to assessments and taxation which govern their actions.
Regarding the first argument, Article VII § 23 provides in part:
"Prior to the end of the third year after the effective date of this constitution, the assessors and the Louisiana Tax Commission or its successor shall complete determination of the fair market value or use value of all property subject to taxation within each parish for use in implementing this Article."
The initial argument is that the actions of which plaintiffs complain were actions taken under this constitutional provision; that the assessors and the Tax Commission are mandated to act together to revalue property and, as they did not act together, but rather the Tax Commission ordered the assessors to adopt a certain valuation to which the assessors never agreed, this constitutional mandate was violated.
It is our view that this constitutional provision is inapplicable, as the Tax Commission, the Board of Review and the assessors agreed in testimony in both cases that this revaluation was not the "determination of the fair market value or the use value of all property subject to taxation" for which Article VII § 23 provides, but rather was simply a continuing revaluation of vacant lands for equalization purposes, part of a program begun in 1972. On this point, Dr. Claude Mauberret, Assessor for the Second Municipal District, testified as follows:
"Q. Now, have you received any notice from the legislature or the Tax Commission or any other authority up until this date to have a meeting to determine the fair market value or use value of all property subject to taxation within the Parish of Orleans? Has anyone yet attempted to implement or enforce Article VII, Section 23?
"A. No, sir.
"Q. It is your testimony that you are waiting for the legislature to give you direction before you do this?
"A. That's right, sir."
Transcript, Case No. 602-253 (Court of Appeal No. 7615), p. 74.
Further, C. Gordon Johnson, Chairman of the Louisiana Tax Commission, in response to a similar line of questioning, testified as follows:
"Q. I don't want to gild the lily as the Judge suggests, but I want to be certain that is your testimony that the Louisiana Tax Commission, to date, has done nothing to implement the provision of Article VII, Section 23 of the new constitution?
"A. Only having committees getting information to present to the legislature.
"Q. And the legislature is going to find the funds and find [define] fair market value and set out the guidelines to carry out this function?

*300 "A. That's right.
"Q. And it's your testimony that once this is done, the legislature appropriates the money and sets out the guidelines, you will not do anything, you will let it up to the assessors?
"A. We will supervise and hear protests. It is my understanding of the instructions that the appeals will be made directly to the Tax Commission of all protests.
"Q. If that is what your plans are to do, then why are you doing what you are doing now since you will have to redo it within a couple of years?
"A. We are continuing something we started in 72."
Transcript, Case No. 602-253 (Court of Appeal No. 7615), pp. 115, 116.
Thus, it is clear that this action on the part of the Tax Commission is wholly unrelated to the purpose envisioned in Article VII § 23, and the section is simply not applicable.
Before considering the question of whether the Tax Commission and the Board of Review acted within the scope of the statutory provisions governing their respective responsibilities, it must be determined whether the Board of Review continued to exist after the effective date of the new constitution. The plaintiffs argue,
"Since all laws in conflict with this new Constitution ceased on its effective date, all laws granting to the Orleans Parish Board of Review powers to recommend property values to the Louisiana Tax Commission also ceased on December 31, 1974." Brief on Behalf of Plaintiffs-Appellees and Plaintiff-Appellants, p. 5.
It is our view that the Board of Review continued to exist through December 31, 1977. Under Article XIV § 18 of the 1974 Constitution, the following is provided:
"(A) Retention. Laws in force on the effective date of this constitution, which were constitutional when enacted and are not in conflict with this constitution, shall remain in effect until altered or repealed or until they expire by their own limitation."
The plaintiffs apparently contend that Article VII § 18 of the Louisiana Constitution of 1974, providing for ad valorem taxes, assessments, valuation and review, is in conflict with the provisions of the Revised Statutes dealing with the Board of Review. There is no doubt that these provisions are in conflict. However, § 18 is not effective until January 1, 1978, and with respect thereto Article XIV § 13 of the 1974 Constitution states:
"Section 13. Section 18 and Section 20 of Article VII shall become effective January 1 of the year following the end of three years after the effective date of this constitution. Until that date, the provisions of the Constitution of 1921 governing matters covered by those Sections shall continue to apply, notwithstanding any contrary expiration date stated in any provision thereof concerning the veterans' homestead exemption."
Accordingly, at the time relevant to this case, the Board of Review functioned under the 1921 Constitution, with the powers and authority granted to it by R.S. 47:1931 and 47:1996. This conclusion is bolstered by the fact that the Louisiana legislature enacted Act 1773 in its regular session of 1975, amending and re-enacting R.S. 47:1931 relative to the membership of the Board of Review in Orleans Parish.
The final question to be resolved, therefore, is whether the Board of Review and the Tax Commission, as the trial court judge said, "followed the procedural law" in revaluing these vacant lands. In reaching his conclusion that these parties failed to follow statutory mandates, the trial judge relied heavily on R.S. 47:1909, which sets forth the powers and authorities of assessors in Orleans Parish. The pertinent language there states:
"The assessors elected in the Parish of Orleans . . . shall constitute a board of assessors for the parish and each assessor shall independently exercise his functions in the assessing and listing of the property in and for his respective district within the parish."
*301 Although we agree that the assessors are independent in their assessments of the value of property within their parish, it is clear that at the time of this case, their assessments were subject to review by the Board of Review. R.S. 47:1931 is very specific. This section states, "Assessments throughout the state shall be subject to review by boards of reviewers . . . ." (Emphasis added.) There is no question, then, whether the decision of the assessors is a final one. It obviously is subject to review. However, we must now address the question of whether this review and subsequent change by the Tax Commission were properly effected.
The plaintiffs' assertions that the Board of Review and the Tax Commission acted improperly are based primarily on R.S. 47:1995, 47:1996 and 47:1990. The essence of §§ 1995 and 1996 is that after a certain specified time period, the assessors, under 47:1995, and the Board of Review, under 47:1996, shall certify the assessment rolls (to the Board of Review, where the assessors are certifying, and to the Louisiana Tax Commission, where the Board of Review is certifying). R.S. 47:1996 concludes by requiring that the Tax Commission complete its work by October 15th of each year.
The plaintiffs' first contention is that neither of these certifications were accomplished within the prescribed time period. From the record, it appears that the reason for failure of the initial certification (by the assessors to the Board of Review, which could have permitted the Board of Review subsequently to certify the rolls to the Tax Commission) was the assessors' disagreement with the proposed revaluation to 20% of fair market value of vacant lands in the Second and Third Municipal Districts. No other explanation for the assessors' failure to certify timely is given. In fact, in the first lawsuit, the record of which has been stipulated into the record in this case, the assessors intervened in opposition to the action of the Tax Commission and the Board of Review. From the testimony of both assessors, it is clear that they have never agreed to the change. As a result of this position, then, the assessors simply chose not to certify their rolls at the prescribed time. Consequently, we do not believe that the actions of the Board of Review in failing to certify timely can be ascribed to any fault of the Board, and assessments which were ultimately ordered by the Tax Commission cannot be rendered invalid because of the failure of the assessors themselves, who were attacking that very action, to do their duty timely. Further, the failure to certify the assessment rolls within the provided time period has not prejudiced any taxpayer or denied any rights which would require a conclusion that the assessments in the Second and Third Municipal Districts on their property for 1976 were null and void.
The purpose of the certifications actually is addressed to the internal relationships between the assessors, Boards of Review and Tax Commission; it serves to set in motion some other ministerial act. These sections of the Revised Statutes are not designed essentially as protections for the taxpayers against the taxing sovereign. While the failure to comply with them is not condoned, we can find no fundamental prejudice to the rights of these taxpayers, nor was any shown as a result of this failure. The same analysis is true relative to the failure of the Tax Commission to complete its work by the 15th of October.
The plaintiffs further argue, under 47:1995, that an improper public notice was given to the taxpayers regarding the assessment rolls. The specific language reads:
"The board, for a period of ten consecutive days from the time that the assessment rolls are certified and delivered to it by the assessor, shall conduct public hearings for all persons desiring to be heard on the assessments of real and personal property. Notice of such public hearings shall be given by the board of assessors by publication as provided herein for notice of exposure of the rolls for inspection."
Plaintiffs' contention here is that the notice which was published by the Board of Review in the daily newspaper *302 referred to a hearing for assessment changes that had been made by the assessors, and that at the hearing the Board of Review also considered the changes which they were recommending on the vacant lands and to which the assessors did not agree. We do not believe this position has any merit. The notice itself said, "The Board of Reviewers will consider such other business which may come before the Board," and in conjunction therewith, the Board sent to each taxpayer a specific notice (to which counsel stipulated at trial) to show cause at that very meeting why the assessments on vacant lands owned by them in these two municipal districts should not be increased. Accordingly, the notice requirement of R.S. 47:1995 was met, and there is no viable complaint with respect thereto. We should note also that even though the above-quoted law says that the hearings can be held only after the assessment rolls are certified, which they were not, plaintiffs nonetheless made an appearance to register their complaints. They apparently did so without regard to the fact that the assessment rolls were not certified, but now complain of the lack of certification in this lawsuit.
Finally, plaintiffs argue that the notice required by R.S. 47:1990 was not provided. That section states, in part:
"Whenever the tax commission shall make any change or correction in an assessment, it shall at the same time forward to the auditor a copy of the instructions furnished to the assessor or tax collector. A copy of these written instructions shall be forwarded by the tax commission to the taxpayer by registered mail, and such written instructions, together with the return receipt of the taxpayer therefor, shall be sufficient notice of such change."
Plaintiffs argue that the changes in the assessments are illegal and void in that such notice by registered mail of the changes was not sent to individual taxpayers.
In resolving this contention, the language of the entire section must be considered. R.S. 47:1990 states:
"The tax commission may change or correct any and all assessments of property for the purpose of taxation, in order to make the assessments conform to the true and correct valuation, not to exceed its actual cash value. Such change or correction may be made by the tax commission at any time before the taxes levied have actually been paid.
"In order to correct or change any such assessment, it shall only be necessary for the tax commission to issue written instructions to the assessor to make the change upon the assessment roll, and in the event the assessment roll has been delivered to the tax collector, then to direct the tax collector to make such change upon the tax roll in his possession and to collect taxes according to such change. Whenever the tax commission shall make any change or correction in an assessment, it shall at the same time forward to the auditor a copy of the instructions furnished to the assessor or tax collector. A copy of these written instructions shall be forwarded by the tax commission to the taxpayer by registered mail, and such written instructions, together with the return receipt of the taxpayer therefor, shall be sufficient notice of such change.
"The written instructions issued as above provided by the tax commission to the tax collector shall authorize him to collect all taxes according to such change and shall be his authority to make the necessary deduction of increase on his tax roll and in his settlement for taxes with the auditor."
It is clear from a reading of that section that the Tax Commission has absolute authority to change and/or to correct all assessments made by the assessors, and that in order for such a change to be made, it shall be necessary only for the Tax Commission to issue written instructions to the assessor when, as in this case, the assessment rolls have not yet been delivered to the tax collector. Such written instructions were in fact given to the assessors here, not on one but on two occasions. That action changed the assessments.
*303 The notice requirement to the taxpayer is clearly a protection and insures that taxpayers will be accorded procedural due process before their tax assessment is increased. Its purpose is to put the taxpayer on notice that his rights may be adversely affected, which would then allow him to proceed in accordance with the remedies provided by law. The record in this case is abundantly clear that, although the letter of this provision may not have been met, the spirit was. These taxpayers were aware from the very beginning of these proceedings, at least from August 1975, that the Board of Review intended to recommend to the Tax Commission a 20% increase in the fair market value of these properties, and that the Tax Commission had gone on record as saying that they were going to accept these recommendations.
Evidence of plaintiffs' awareness is the fact that they have been opposing these recommendations from the very beginning, all the way through to a meeting in early 1976, at which the plaintiffs were represented by their attorneys, and at which the Tax Commission, the Board of Review and the assessors finally discussed the evaluations in question. A notice here under the technical language of the statute would have been superfluous and a useless gesture as far as plaintiffs were concerned.
For the foregoing reasons, the trial court's action in dismissing plaintiffs' suit for declaratory judgment is sustained, and the trial court's decision granting relief to those plaintiffs who paid under protest is reversed and the suit of those plaintiffs is hereby dismissed at their cost.[2]
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
NOTES
[1] This matter was originally considered on appeal of an injunction granted by the district court. On appeal, this court reversed. La. App., 336 So.2d 1037, writ denied, La., 339 So.2d 353. All parties stipulated that the record from the first case would be made part of the record in the case presently before us.
[2] Due to the result we reach in this case, there is no reason to address the question of whether these plaintiffs could bring a class action.