43 N.Y.2d 425 (1977)
Citibank, N. A., Appellant,
v.
City of New York Finance Administration, Respondent.
Chase Manhattan Bank, N. A., Appellant,
v.
Finance Administration of the City of New York et al., Respondents.
Court of Appeals of the State of New York.
Argued September 6, 1977.
Decided December 21, 1977.
J. Paul McGrath, Bob D. Mannis, W. Foster Wollen and John T. Klug for appellants.
W. Bernard Richland, Corporation Counsel (Samuel J. Warms of counsel), for respondents.
Chief Judge BREITEL and Judges GABRIELLI and COOKE concur with Judge FUCHSBERG; Judge JONES dissents and votes to reverse in a separate opinion in which Judges JASEN and WACHTLER concur.
*428 FUCHSBERG, J.
The two petitioners, who each lease and occupy premises in the City of New York, where they have their principal places of business, are banking associations chartered under the laws of the national Government. In separate proceedings, brought under CPLR article 78 and considered together, they challenge imposition upon them of the city's commercial rent tax (Administrative Code of City of New York, ch 46, tit L) covering the period from June 1, 1970 through May 31, 1972.[1]
The appeals to us are from judgments of the Appellate Division, which, one Justice dissenting, confirmed final determinations of the New York City Finance Administration adverse to the banks and dismissed their petitions.
The pivotal issue is whether, because of the provisions of applicable Federal law, the appellants, as national banks, were immune from the tax assessed for the period in question. In particular, the resolution of this case turns on an analysis of the effect on New York tax laws of the enactment of United States Public Law No. 91-156 (83 US Stat 434), which in essence permitted States and their subdivisions to tax national banks on an equal footing with State banks.
Adopted in 1969, United States Public Law No. 91-156 *429 constituted the then latest exercise of the Federal Government's authority, recognized since the historic decision in McCulloch v Maryland (17 US 316, 432, 439), to allow States to tax national banks (Agricultural Bank v Tax Comm., 392 US 339, 343, Owensboro Nat. Bank v Owensboro, 173 US 664; see, also, Liberty Nat. Bank & Trust Co. v Buscaglia, 26 AD2d 97, revd 21 N.Y.2d 357, affd upon rearg 23 N.Y.2d 933).
As its legislative history makes clear, the passage of the 1969 statute was precipitated by State reaction to the United States Supreme Court decision in the Agricultural Bank case (supra). In its holding that Massachusetts could not apply its sales tax to purchases made by national banks within its boundaries the court there reiterated that Federal statutory enumeration of the taxes States might levy on national banks carried with it a prohibition on the imposition of any others (see 115 Congressional Record 19909 [1969]; HR Rep No. 91-290, 91st Cong, 1st Sess, pp 6-7 [1969]). In the wake of that decision, a large number of States and localities found themselves deprived of tax sources on which they had come to rely; representatives of the overwhelming majority of these pressed Congress to relieve their plight (see Testimony Received in Consideration of HR 7491 and Related Bills: Hearings Before the House Committee on Banking and Currency, 91st Cong, 1st Sess 6-27 [1969]; for the effects in New York see Liberty Nat. Bank & Trust Co. v Buscaglia, supra).
Public Law No. 91-156 brought a two-stage change in section 5219 of the United States Revised Statutes (US Code, tit 12, § 548); it provided for "temporary" and "permanent" amendments. The "permanent" change eliminated the exemption of national banks from taxes to which State banks were subject in the State where the national banks' principal offices were located; this change, to go into effect on January 1, 1972 (Public Law No. 91-156, § 2, subds [a], [b]), subsequently was delayed until January 1, 1973 (Public Law No. 92-213, § 4, subd [a]; 85 US Stat 775).[2] The "temporary" one (Public Law No. 91-156, § 1) and a "saving provision" (§ 3) were (as amd by Public Law No. 92-213) to govern taxation of National banks during the transition period between December 24, 1969, the enactment date of the new law, and January 1, 1973.
It is on subdivision (a) of section 3 of the saving provision *430 that appellants rely.[3] They point out that, during the temporary period, that section protected national banks from losing any pre-existing immunity from State tax laws unless and until the Legislature of a State took "affirmative action" to apply such taxes to them. The banks also assert that the New York City commercial rent tax, which had been in force since 1963, when it was authorized by chapter 257 of the Laws of New York of that year, was neither newly enacted nor the object of the requisite "affirmative action" of the Legislature before the tax assessments in litigation here were levied. For its part, the city's position is that its exercise of "affirmative action" is to be found in the passage by the New York State Legislature of chapter 166 of the Laws of 1970 which modified the original State law authorizing the rent tax, this though the 1970 enactment did not expressly refer to national banks.
Having fully considered these contentions, and, in the course of doing so, other pertinent provisions of Public Law No. 91-156 as well, we hold, on two independent grounds, that the rent tax was properly levied on the petitioners for the period in question.
Because the parties have preferred to focus on whether there was "affirmative action", we initially discuss the effect of legislation by which the city's commercial rent tax was amended to increase its rates significantly as of June, 1970 (L 1970, ch 166, amdg Administrative Code of City of New York, § L46-1.0, subd 3).[4] We conclude that its passage constituted such action.
The banks seek to read into the Federal statute a requirement that, before imposition of State taxes on national banks, even though the levying statute is a general one, a conscious and explicit decision had to be made to subject these banks to the tax.[5] But the Federal statute contains no such requirement *431 And, since even legislative decisions to allow existing rules of law to stand may be dynamic in their effect, where they bring meaningful increases in the rates of a revenue measure it is difficult to perceive how they can be regarded as anything but permeated with "action".
Moreover, the mode of enacting amendments is to re-enact the statute as amended much as a codicil republishes a will. It is a well-established proposition of law that an amendment is a re-enactment of the statute amended, albeit without any break in the continuity between the statute before amendment and the statute after amendment (see Lyon v Manhattan Ry. Co., 142 N.Y. 298, 303-304). In fact, draftsmen of bills and other interested members of Legislatures, in considering bills providing for amendments, read them against existing law. And an amendment is enacted exactly like a wholly new statute. Thus, the amendment to the tax statute here, passed by the New York State Legislature and signed by the Governor, necessarily involved "affirmative" conduct.
From the point of view of Congress, it was the possibility that inequitable or double taxation might be imposed immediately on national banks that was the crux of its concern. There was certainly nothing in the legislative history to suggest an intention to postpone taxation on national banks under general statutes like New York City's commercial rent tax law. To the contrary, the saving provision was designed to avoid upsetting sophisticated, delicately balanced State statutes enacted to equalize taxation between bank and nonbank entities; the Congressional Managers' Conference Report makes that most evident (1969 US Code, Congressional and Administrative News, vol 2, pp 1594, 1598-1599, 1602). Since any State legislative attempt to amend such a statute unavoidably would alert the Legislature to enactment of the new Federal statute, the saving provision therefore could be effected without requiring the States to mention national banks explicitly in amendatory tax legislation.
We, therefore, turn now to the other, and at least equally dispositive ground for our determination. It derives from subdivision (b), rather than subdivision (a), of section 3 of Public Law No. 91-156. Subdivision (b) of section 3 expressly *432 provides that the prohibition of (a) "does not apply to * * * any tax on tangible personal property * * * or for any license, registration, transfer, excise or other fee or tax imposed on the ownership, use or transfer of tangible personal property imposed by a State". Such taxes are by its terms excused entirely from the requirement for either affirmative action or new enactment. For these excepted taxes, the "temporary" amendment of section 5219 allowed automatic imposition of nondiscriminatory State taxes without any further legislative input.
New York City's commercial rent tax from its inception has been and continues to be regarded as one on tangible personal property. Judge (later Chief Judge) FULD, in Ampco Printing-Advertisers' Offset Corp. v City of New York (14 N.Y.2d 11), spelled out the precise nature of the property interest of commercial tenants embraced by this local law. After describing the tax as one "imposed on a tenant of taxable premises according to his base rent for the tax year", and noting that "`tenant' is defined as anyone who pays rent as lessee, sublessee, licensee or concessionaire", he continues, more generally, "`It is significant to note that nowhere in the Tax Law has the Legislature characterized a leasehold as taxable real property. Such omission is understandable, as a lease for years is deemed personalty [cases cited].' * * * In any event, though, the tax could not be considered a tax on `intangible' personal property. A leasehold has consistently been regarded as tangible. (See, e.g., People ex rel. American Ice Co. v. State Bd. of Tax Comrs., 153 App. Div., 532, 539 [majority opinion], 541 [minority opinion], mod. 207 N.Y. 766 * * *.)" (Ampco Printing-Advertisers' Offset Corp. v City of New York, 14 N.Y.2d 11, 20, 21, 22, supra, app dsmd 379 US 5.)
The proposition that a leasehold constitutes tangible personal property for tax purposes has cut both ways. In the Ampco case, it resulted in validation of a tax liability; in Matter of Fort Hamilton Manor v Boyland (4 N.Y.2d 192) and in Matter of Grumman Aircraft Eng. Corp. v Board of Assessors of Town of Riverhead (2 N.Y.2d 500, 507, cert den 355 US 814) it led to mitigation or removal of a tax burden. Also pertinent, in light of subdivision (b) of section 3's reference not only to "any tax on tangible personal property" but to an "excise * * * tax imposed on the ownership [or] use" of such property as well, is that, in Ampco (supra, at pp 21, 23), the court characterizes the tax here as an excise tax on the use of *433 property. (See, also, Matter of Penney Co. v Lewisohn, 40 AD2d 67, affd 33 N.Y.2d 528; 2 Powell, Real Property, par 221, subd [2].)
The correctness of this conceptualization of a leasehold interest as tangible personal property in the context of Public Law No. 91-156 is underscored upon further research of that statute's legislative history. Thus, while our attention has not been directed to any report separately discussing a State-imposed rent tax on facilities used by a national bank in the State where its principal office is located, we find it significant that subdivision (a) of section 1 explicitly validates such taxes when imposed by a State on a national bank whose principal office is in another jurisdiction. It does so, inter alia, by authorizing a tax on "the occupancy of real property" of such out-of-State national banks (Public Law No. 91-156, § 1, subd [a], amdg US Rev Stat, § 5219, subd 5 par [b], cl [2]).
Furthermore, referring to this amendment, the Senate Committee on Banking and Currency minced no words in reporting that "the taxes listed in the new section 5 (b) * * * are not considered to be taxes on intangible personal property as that term is used in the new section 5 (a), and they could be imposed on national banks by the States during the peiod up to January 1, 1972, as well as after that date" (US Sen Rep No. 91-530, 91st Cong, 1st Sess 3 [1969]; 1969 US Code, Congressional and Administrative News, vol 2, pp 1595-1596).
We do not regard this comment as any the less telling because it occurred in the course of an explanation of the effect of the amendment on taxes on out-of-State national banks, since the undeniable over-all design of the amendments to the then existing Federal legislative scheme was to give States expanded power to subject national banks headquartered within their borders to all nondiscriminatory taxes rather than to a limited "laundry list" (115 Congressional Record 19912 [1969]). There is consequently no reason to believe that the express equating of "occupancy of real property" with "tangible personal property" did not apply.
Accordingly, we conclude that Public Law No. 91-156 did not immunize petitioners from liability for New York City commercial rent taxes during the years at issue. It follows that the judgments from which the appeals are taken should each be affirmed.
JONES, J. (dissenting).
I would reverse the judgment of the *434 Appellate Division in each case and annul the determination of the City Finance Administration imposing the New York City commercial rent and occupancy tax on petitioners national banks for the period prior to January 1, 1973.
In 1969 the Congress amended section 5219 of the Revised Statutes of the United States (US Code, tit 12, § 548) specifically to authorize State taxation of national banks in prescribed ways. Broad authorization was granted on a permanent basis beginning in 1972 (later deferred to 1973); interim provisions were prescribed with respect to the transitional period prior to 1973. We are here concerned only with such interim provisions.
I read section 3 (subd [a], par [2]) of the amendatory Federal statute (US Public Law No. 91-156), authorizing State taxation in the period prior to January 1, 1973 in the event of "affirmative action of the State legislature", as requiring a conscious and manifested determination on the part of the State legislature to subject national banks to the imposition of the permitted State taxes. The record of the deliberations of the Senate Committee on Banking and Currency supports this conclusion: "The committee realizes that for many years the tax structure within the States has been drawn in recognition of the different positions of State and National banks with respect to liability for State taxes. In effect, the States have adopted many different formulas in an attempt to equalize the total tax burden between State and National banks. If by congressional action banks were automatically subject to taxes which they had not been previously paying, in addition to the taxes which they are now paying, the effect may be to destroy the degree of equality that the State legislature, by conscious effort, attempted to achieve. Accordingly, the committee believes it wise to require positive State legislative action as a prerequisite to the imposition on banks of the additional taxes authorized by the bill." (Sen Rep 91-530, 91st Cong, 1st Sess 6 [1969]; 1969 US Code, Congressional and Administrative News, vol 2, 1594, 1598-1599; emphasis supplied.) (See, also, the final conference report of the managers on the part of the House of Representatives: HR Rep No. 91-728, 91st Cong, 1st Sess 5 [1969]; 1969 US Code, Congressional and Administrative News, vol 2, pp 1602-1603.)
The enactment of chapter 166 of the Laws of 1970 by our State Legislature constituted no such "affirmative action". It served only to increase the rates of the pre-existing tax. *435 Nothing in the record before us reveals that the City of New York, the sole beneficiary of the increased rates, in seeking the amendment or the State Legislature in enacting it had extension of the tax to national banks even remotely in mind. The Governor's message of necessity on which enactment of chapter 166 was predicated makes no reference to taxation of national banks. Notwithstanding particularized postargument requests to the city therefor, no statement of estimated revenue to be realized from the amendment or other document submitted by the city in support of the enactment of chapter 166 has been furnished in which any reference is made to estimated income to be derived from taxes to be paid by national banks or to any other aspect of taxation of national banks. No shred of contemporaneous proof suggests that either the city administration or the State Legislature was even aware that section 5219 had been amended or that thereby the Congress had granted authority for expanded State taxation of national banks.
In such circumstances I cannot conclude that legislative action, taken wholly without reference to the Federal statute, constitutes the "affirmative action" contemplated by the Congress when it authorized additional State taxation of national banks. Nor can I conclude that the enactment of the 1970 increase in rates may be so construed as to support the city's alternative contention that the "saving provision" of the Federal statute had no application inasmuch as the taxes in question were not imposed under the authority of pre-existing State legislation but rather were imposed under the authority of the 1970 amendment only.
I must also disagree with respect to the second ground proffered by the majority to sustain imposition of the New York City commercial rent and occupancy tax on petitioners, viz., application of subdivision (b) of section 3 of Public Law No. 91-156. The decision in Ampco Printing-Advertisers' Offset Corp. v City of New York (14 N.Y.2d 11, app dsmd 379 US 5), heavily relied on, is by no means conclusive that in the present context the commercial rent tax is a tax on tangible personal property. What was necessarily decided by the court in Ampco, which dealt with the validity of the commercial rent and occupancy tax under our State Constitution, was that the tax there was not a prohibited ad valorem tax on intangible personal property. Even if that case be read, however, as characterizing the tax for State constitutional purposes as a *436 tax on tangible personal property  which was not necessarily there determined  such a description could not and should not be binding for present purposes or classification within the contemplation of Congressional statutes. Nothing suggests that the opinion in Ampco was written with a Federal statute like Public Law No. 91-156 in mind. There was not then posed or considered the question now before this court  how the commercial rent and occupancy tax is to be regarded for purposes of Federal, not New York, law authorizing local taxation of national banks. Similarly Matter of Fort Hamilton Manor v Boyland (4 N.Y.2d 192) and Matter of Grumman Aircraft Eng. Corp. v Board of Assessors of Town of Riverhead (2 N.Y.2d 500, cert den 355 US 814) arose in a totally distinguishable context. Finally, even the City of New York itself has never asserted that authorization for the present tax is to be found in subdivision (b).
In each case: Judgment affirmed, with costs.
NOTES
[1] Correctness of the amounts assessed ($2,702,909.84 in petitioner Citibank's case and $3,097,732.94 in that of petitioner Chase) does not appear to be in dispute.
[2] It is agreed that appellants have been subject to the New York City rent tax since that time and therefore this litigation encompasses no subsequent period.
[3] The pertinent text of subdivision (a) of section 3 of the Public Law No. 91-156 reads as follows:

"(a) * * * [P]rior to January 1, [1973], no tax may be imposed on any class of banks by or under authority of any State legislation in effect prior to the enactment of this Act unless
"(1) the tax was imposed on that class of banks prior to the enactment of this Act, or
"(2) the imposition of the tax is authorized by affirmative action of the State legislature after the enactment of this Act."
[4] In a graduated scale, the rates were increased up to a maximum of 50% over the immediately pre-existing ones.
[5] While the city may not have gone through the formality of expressing an intent to regard the amendment to the tax law as "affirmative action", it had already made known its ongoing concern with the question of the tax's continued viability in a letter submitted to the relevant Congressional Committee by a Representative who had authored remedial legislation (Testimony [on] HR 7491, pp 14-15).